**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARK ANTHONY MILLER,** : | |
| : | |
| Petitioner : | |
| : | **CIVIL NO. 3:CV-11-0993** |
| v. : | |
| : | **(Judge Caputo)** |
| **U.S. PAROLE COMMISSION,** : | |
| : | |
| Respondent : | |

**M E M O R A N D U M**

**I.   Background**

Petitioner Mark Anthony Miller, a federal inmate formerly housed at USP-Lewisburg, in Lewisburg, Pennsylvania, is serving a life sentence imposed by the Superior Court of the District of Columbia for assault with intent to commit robbery while armed.[1]  Presently before the court is his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Along with his petition, Mr. Miller filed a motion to proceed *in forma pauperis.*  Mr. Miller has since paid the $5.00 filing fee in this matter.[2]

In his Petition, Mr. Miller alleges that the United States Parole Commission (the Commission) wrongfully denied him parole by applying the wrong guidelines to his initial parole hearing and subsequent rehearings in 2006 through 2010.  He

---

[1]  The BOP's Inmate Locator presently shows Mr. Miller as being housed at USP Lee, in Pennington Gap, Virginia.  *See* http://www.bop.gov/inmateloc/.

[2]  By virtue of Mr. Miller's payment of this fee, his motion to proceed *in forma pauperis* will be denied as moot.

asserts the Commission impermissibly used its own less favorable 2000 guidelines (2000 Guidelines), 28 C.F.R § 2.80(o), rather than the regulations promulgated by the District of Columbia Board of Parole (the DC Board), D.C. MUN. REGS. tit. 28, §§ 100 *et seq.* (1987)(repealed Aug. 5, 2000), in 1987 (1987 Guidelines) when considering him for parole.  He also claims the Commission violated his due process rights by failing to grant him a yearly parole rehearing.  (Doc. 1, Pet.)  For the reasons that follow, Mr. Miller's Petition will be denied.

## II.	Standard of Review

Challenges by a petitioner in federal custody concerning parole decisions go to the execution of a sentence and are properly brought against petitioner's custodian under 28 U.S.C. § 2241.  *See Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241-42 (3d Cir. 2005)(§ 2241 allows federal prisoner to challenge the execution of sentence, such as the denial of parole).

It is well-settled that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmate of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979); *see also Ellis v. Dist. of Columbia*, 84 F.3d 1413 (D.C. Cir. 1996) (DC parole statute and regulations do not create any liberty interest in parole).   Even though an inmate has no liberty interest in parole release protected by the Due Process Clause, a fundamental due process right to be free from "capricious decision making" protects parole applicants from being denied

parole for "arbitrary or constitutionally impermissible reasons." *Block v. Potter*, 631 F.2d 233, 236 (3d Cir. 1980).

A federal court's review of a decision issued by the Commission is limited to an abuse of discretion standard. *Furnari v. Warden*, 218 F.3d 250, 254 (3d Cir. 2000). The United States Court of Appeals for the Third Circuit Court has recognized that a federal court's review of a decision issued by the Commission is limited. *Id*. The court is not empowered to substitute its judgment for that of the Commission in evaluating the habeas petitioner's claims, unless the Commission's exercise of discretion represents an egregious departure from rational decision-making. *Id*. "The appropriate standard of review of the Commission's findings of fact 'is not whether the [Commission's decision] is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [Commission's] conclusions embodied in its statement of reasons.'" *Zannino v. Arnold*, 531 F.2d 687, 691 (3d Cir. 1976); *see also* 28 C.F.R. § 2.18 ("The granting of parole to an eligible prisoner rests in the discretion of the United States Parole Commission."). To that end, the review should consider whether the Commission "'has followed criteria appropriate, rational and consistent' with its enabling statutes so that its 'decision is not arbitrary and capricious, nor based on impermissible considerations.'" *Furnari*, 218 F.3d at 254 (quoting *Zannino*, 531 F.2d at 690).

### III.     Relevant Statutory Background

In 1985, the DC Board adopted guidelines that detailed and narrowed its discretion when making parole determinations. These guidelines were published and codified in 1987. *See Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69-71 (D.D.C. 2008)(discussing the purpose and operation of the 1987 Guidelines). Under the 1987 Guidelines, after a District of Columbia (DC) felony offender served his minimum sentence, he was eligible for parole consideration. D.C. MUN. REGS. tit. 28, § 200.1. Once eligible for parole, the DC Board was authorized to consider the offender's suitability for release on parole:

> [w]henever it shall appear to the [DC Board] that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he or she has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the [DC Board] may authorize his or her release on parole upon such terms and conditions as the [DC Board] shall from time to time prescribe.

D.C. CODE § 24-404(a).

The 1987 Guidelines of the DC Board set forth a scoring system for use in deciding whether to grant or deny parole. *See* D.C. MUN. REGS. tit. 28, § 204.1 (1987); *Sellmon,* 551 F.Supp.2d at 69-73; *Ellis*, 84 F.3d at 1415-17. Under these regulations, "even if the prisoner established everything the statute required, the Board of Parole still had discretion to deny parole." *Ellis*, 84 F.3d 1415.

> In sum, the District's parole system is grounded in the exercise of discretion by the Board, with a numerical system to aid in the exercise of that discretion. The numerical system is not a rigid formula, however, because

> the Board is not required to either grant or deny parole based upon the score attained ... [T]he Board [has] authority, in unusual cases, to ignore the results of the scoring system and either grant or deny parole in the individual case, conditioned upon the Board's setting forth in writing those factors it relied on in departing from the result indicated by the scoring system. Therefore, because the statute and regulations vest in the Board substantial discretion in granting or denying parole ... they lack the mandatory character which the Supreme Court has found essential to claim that a regime of parole gives rise to a liberty interest.

*McRae v. Hyman*, 667 A.2d 1356, 1360-61 (D.C. 1995)(internal quotations and citations omitted).

Initially, each parole applicant is assigned a salient factor score (SFS) which serves as "one factor" in determining parole eligibility by assessing the potential risk of releasing the prisoner. *Ellis*, 84 F.3d 1415-16; D.C. MUN. REGS. tit. 28, § 204.2. Six categories are then evaluated and given a numerical value which when combined range from 0 - 10. *Id.* at 1416.[3] The DC Board then "modifies a prisoner's risk category by adding or subtracting points for pre and post-incarcerations factors." *Id.* at 1416. Points are added if: (1) "[t]he prisoner's current conviction involved violence against a person, the use of a dangerous weapon, or drug distribution; or if the prisoner has two or more previous convictions for these types of crimes;" or (2) "the prisoner has committed serious disciplinary infractions."

---

[3] The six categories considered are: (1) "Prior convictions and adjudications (ranging from 0 - 3)," (2) "Prior commitments of more than thirty days (0 - 2)," (3) "Age at the time of the commission of the current offense (0-2)," (4) "Recent commitment-free period (0-1)," (5) "Status of the prisoner at the time of commission of the current offense (0-1), and" (6) "History of heroin or opiate dependence (0-1)." *Ellis*, 84 F.3d at 1416; D.C. MUN. REGS. tit. 28, § 204.4.

*Id.* at 1416; D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, § 204.18(a)-(h).   A point is subtracted if the prisoner "has demonstrated sustained achievement in prison programs, industries or work assignments."  *Id.* at 1416; D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, § 204.18(I).  This score is then either increased or decreased in one point increments depending on the prisoner's program achievement and institutional adjustment.  *See Id.* at 1416.

The application of these factors yields the offender's total point score (TPS) which can range from 0 - 5.  *Id.* at 1416; D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, § 204.19.  In the case of an adult offender, a TPS of 0, 1, or 2 indicates that parole may be granted after the initial hearing, and a score of 3 or more indicates that parole should be denied and a rehearing scheduled.  *See* D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, §§ 204.19.  In subsequent hearings, the DC Board begins with the total point score from the previous hearing.  *See* D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, § 204.21.  At rehearings, adult offenders with a TPS between 0 and 3 "shall be granted parole" while those with TPS of 4 or 5 "shall be denied" parole.  *Id*.  Regardless of the prisoner's TPS, "the regulations permit the Board to deviate from the parole determination suggested by the guidelines 'in unusual circumstances'".  *Ellis*, 84 F.3d at 1416.

> The Board may, in unusual circumstances, waive the SFS
> and the pre and post incarceration factors set forth in this
> chapter to grant or deny parole to a parole candidate.  In
> that case, the Board shall specify in writing those factors
> which it used to depart from the strict application of the
> provisions of this chapter.

D.C. M<small>UN</small>. R<small>EGS</small>. tit. 28, § 204.22 .  The DC Board identified a non-exhaustive list of "factors countervailing a recommendation to grant parole" to be considered at an offender's initial and reconsideration hearings:

-6-

- the offender has had repeated failures under parole supervision;

- the instant offense(s) involve(s) on-going criminal behavior;

- the offender has a lengthy history of criminally-related alcohol abuse;

- the offender has a history of repetitive, sophisticated criminal behavior;

- the offender has an unusually extensive or serious prior record, including at least five felony convictions;

- the instant offense(s) involve(s) unusual cruelty to victim(s);

- the offender has engaged in repeated or extremely serious negative institutional behavior;

- the offender has a lengthy history of criminally-related substance abuse;

- the offender had the opportunity, but made little or no effort toward rehabilitation or preparation for remaining crime-free if released to the community; and

- the offender needs programs and/or rehabilitation services to minimize risk to the community when actually released to parole.

*Ellis*, 84 F.3d at 1416; *see also Sellmon*, 551 F. Supp. 2d at 69-71; D.C. MUN. REGS. tit. 28, § 204 and Appendices 2-1 and 2-2 (1987).[4]

---

[4] The DC Board's 1991 Policy Guidelines (not a codified regulation) give greater definition of each of these terms and the criteria and parameters for their usage in parole matters. (*See* Doc. 5-2, ECF pp. 28-36.) Further, in some situations there are limits placed on the duration of the Board's consideration of a countervailing factor that may be considered at an offender's initial hearing, but not again at his rehearing. For instance, the DC Board may only consider certain classes of disciplinary infractions at an inmate's initial parole consideration that have occurred within specified times of the convict's minimum sentence, (*see* Doc. 5-2, ECF p. 34), at his parole reconsideration, the Board may only

(continued...)

As reflected above, the DC Board retained discretion to grant or deny parole notwithstanding the result recommended by the TPS.  *Ellis*, 84 F.3d at 1419 (explaining that "under the regulations, a prisoner with a low total point score shall be granted parole unless the Board, in the exercise of its discretion, believes there is some other reason for not granting him parole."); *see also* D.C. MUN. REGS. tit. 28, § 204.22.  If parole is denied at the initial hearing or a subsequent rehearing, a "set off," or period of time an offender may remain incarcerated before being reconsidered for parole, is established by the DC Board.  While the guidelines set forth a schedule to be utilized when determining the offender's set off is based on the imposed term of imprisonment, "[t]he Board, *in its discretion,* may schedule a reconsideration date later than the prescribed set-off if one or more aggravating factors are present...." *Hall v. Henderson,* 672 A.2d 1047, 1052 (D.C. 1996)(emphasis added); *see also* D.C. MUN. REGS. tit. 28, § 104.11.[5]

On August 5, 1998, pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 (Revitalization Act), Pub.L. No. 105-33, §

---

[4](...continued)
consider certain offenses which "occurr[ed] since the preceding release consideration on the sentence ...". *(Id.*, ECF p. 35.)  This distinction as to the consideration of disciplinary infractions varies significantly from other situations where the same countervailing offense, such as the Board's consideration of the unusual cruelty to victims of the instant offense, may be considered at the offender's initial parole consideration and/or his parole rehearings without restriction.  *See Sellmon,* 551 F. Supp. 2d at 71.  The 1991 Guidelines were in effect from December 16, 1991 until the DC Board issued a new policy guideline on October 23, 1995, superceding it.

[5] When a person is serving a maximum sentence of less than five years, reconsideration shall ordinarily occur within six months. D.C. MUN. REGS. tit. 28, § 104.1.  Offenders serving a maximum sentence of more than five years shall ordinarily receive rehearings within twelve months. D.C. MUN. REGS. tit. 28, § 104.2.

11231(a)(1), 111 Stat. 712, 745, D.C. C\ODE § 24-131(a), the DC Board was abolished, and the Commission assumed jurisdiction over parole decisions for DC offenders.  The Revitalization Act requires the Commission to apply the DC Board's parole criteria, rather than its own guidelines, in deciding a DC offender's parole eligibility.  *See* D.C. C\ODE § 24-131.  Likewise, the regulations specify that for those DC offenders who had their initial parole hearing before August 5, 1998, "the Commission shall render its decision by reference to the guidelines of the former DC Board of Parole in effect on August 4, 1998."  *See* 28 C.F.R. § 2.80(a)(4).  The Commission, like the DC Board, had the authority to depart from the guidelines.  *See Ellis,* 84 F.3d at 1419-20 (holding that the DC Board has discretion to depart from guidelines); *McRae*, 667 A.2d at 1357 (same).

In 2000, the Commission issued new guidelines for determining whether an inmate is eligible for parole.  *See generally* 63 Fed. Reg. 39172 (July 21, 1998). The Commission applied the 2000 Guidelines "to any offender who received an initial parole hearing after August 5, 1998" but before December 4, 2000.  *Sellmon*, 551 F. Supp. 2d at 72; 28 C.F.R. § 2.80(a).  The *Sellmon* court discussed the many similarities between the 2000 Guidelines and the 1987 Guidelines.  *Id.* at 72-73.

Like "the 1987 Regulations, the 2000 Guidelines use a scoring system to determine whether a prisoner is presumptively suitable for parole."  *Id*. at 73; 28 C.F.R. § 2.80(c).  In calculating the SFS, the Commission determines a parole candidate's "degree of risk" of becoming a recidivist.  *Id*. As with the 1987 Guidelines, the 2000 Guidelines determine the "type of risk" that an inmate poses

"by looking at his or her history of violence, the use of a weapon, and/or death of the victim as a result of the candidate's crime." *Id.* at 73; 28 C.F.R. § 2.80(f) - (g). After calculating both the prisoner's degree and type of risk, the resulting "base point score" is converted into a "base guideline range," or a number of months that are added to the prisoner's court-imposed minimum sentence. *Id.* at 73; 28 C.F.R. §2.80(h).

Like the 1987 Guidelines, the 2000 Guidelines also consider the parole candidate's negative institutional behavior and program achievement. However, unlike the 1987 Guidelines, once the Commission adds the base guideline range to the prisoner's minimum sentence, it also adds or subtracts months to account for negative institutional behavior or "superior" program achievement. 28 C.F.R. § 2.80(j) - (k). The Commission retains sole discretion to categorize inmate behavior as either "superior" or "non-superior," and only the former may result in a sentence reduction. 28 C.F.R. § 2.80(e). The resulting total number of months is known as the "total guideline range," which indicates the customary range of time to be served, except in unusual circumstances where the Commission may depart from the total guideline range, before release. 28 C.F.R. § 2.80(n). Under the 2000 Guidelines, a parole candidate is presumptively unsuitable for parole until he has served a period of imprisonment equal to the bottom of his total guideline range. *Sellmon*, 551 F. Supp. 2d at 73; 28 C.F.R. § 2.80 (h), (i) and (l).

Finally, the 2000 Guidelines, like the 1987 Guidelines, allow the Commission to deny parole "notwithstanding the guidelines" in "unusual circumstances." *Id.*; 28 C.F.R. § 2.80 (n). Unlike the 1987 Guidelines, the 2000 Guidelines provide

-10-

examples of "unusual circumstances," but they do not limit the Commission's discretion. They instead state that the Commission may depart for any reason "not fully taken into account in the guidelines" that is "relevant to the grant or denial of parole." *Id*.; 28 C.F.R. § 2.80(n).

### IV.     Mr. Miller's Incarceration History and Parole Record

On November 12, 1992, the Superior Court for the District of Columbia imposed a life sentence on Mr. Miller, with a minimum term of 15 years to be served prior to parole eligibility, after he was convicted of assault with intent to commit robbery while armed. (Doc. 5-1, ECF p. 4, Sentence Monitoring Computation Data.) Mr. Miller became parole eligible on July 31, 2002. (*Id*., ECF p. 5.)

On August 8, 2002, a hearing examiner for the Commission conducted Mr. Miller's initial parole hearing. (*Id*., ECF p. 7.) At the time of the hearing, Mr. Miller had served 121 months of his sentence. (*Id.*, ECF p. 8.) Mr. Miller admitted his involvement in the offense, noting he was addicted to drugs at the time. He stated that, after the drug dealer/victim refused to give him drugs on credit, he stabbed the victim repeatedly with a barbeque fork. (*Id.*, ECF p. 7.) Mr. Miller expressed remorse for the victim. His SFS was 5, and he had a base point score of 7. His total parole guideline range was found to be 175 to 207 months. (*Id*.) He did not contest the SFS, base point score or the total guidelines. (*Id.*) At the hearing it was noted that Mr. Miller had accrued seven prison disciplinary infractions during his incarceration. Several of the misconducts were for Engaging in Sexual Acts

(masturbation) and one for Indecent Exposure.  He also had one disciplinary report for fighting.  Mr. Miller admitted to all of the disciplinary incidents.  The Commission denied him parole and ordered a three year "set off," scheduling a reconsideration hearing in August 2005.  This decision was not administratively appealed.  (*Id.*, ECF p. 9.)

On February 22, 2006, while housed at USP Marion, Mr. Miller had his first reconsideration hearing.  (*Id.*, ECF pp. 33-36.)  At the time of the hearing, he was approximately forty years old.  (*Id.*, ECF p. 35.)  Since his initial hearing, Mr. Miller accrued sixty-one incident reports for rule infractions.  (*Id.*, ECF p. 13 and p. 34.)  Four of these infractions were criminal, including: two destruction of property offenses (one by fire); and two assault offenses.  (*Id.*)  The remaining infractions included engaging in a sexual act, minor assaults, threatening bodily harm, refusing an order, and being unsanitary.  (*Id.*; *see also id.*, ECF pp. 12-32.)  His base point score was 7 and his total guideline range, in large part due to his disciplinary incidents, was computed as  227 - 413 months.  (*Id.*, ECF p. 38.)  On March 23, 2006, the Commission issued its Notice of Action denying Mr. Miller parole and setting a three year reconsideration hearing date of February 2009.  (*Id.*, ECF p. 37.)

Mr. Miller's next reparole hearing was held on June 1, 2009.  (*Id.*, ECF p. 40-45.)  Since his last hearing Mr. Miller was not able to participate in any programming due to his frequent admissions to the Special Housing Unit for thirteen new disciplinary infractions.  (*Id.*)  Two of the incidents were for possession of a dangerous weapon.  (Doc. 5-2, ECF p. 2.)  These new infractions raised his total

guideline range to 251 - 467 months.  His base point score remained at 7.  (*Id*.)  In the Commission's July 3, 2009 Notice of Action, it denied Mr. Miller parole and set a reconsideration hearing for June 2012.  (Doc. 5-2, ECF pp. 1-2.)

Pursuant to the *Sellmon* rule,[6] Mr. Miller was given a parole hearing where he was represented by counsel and during which the Commission applied the 1987 Guidelines.  (*Id*., ECF p. 15.)  His pre-hearing assessment took place on December 24, 2009.  (*Id*., ECF pp. 3-6 and pp. 12-16.)  His prior convictions and prior commitments were reviewed.  (*Id*., ECF pp. 3-11.)  The Hearing Examiner reviewed what Mr. Miller's guidelines would have been at each prior hearing had the 1987 Guidelines been used.  It was determined that at his initial hearing Mr. Miller would have received a TPS of 3, a score that would indicate the denial of parole.  (*Id*., ECF p. 8.)  The Hearing Examiner also noted that during the year prior to Mr. Miller's 2006 rehearing he incurred approximately fifty disciplinary infractions, including six Class II infractions for assault, and one for fire.  (*Id*., ECF p. 13.)  His TPS at his 2006 hearing would have been 3, which would have indicated parole.  However, the Hearing Examiner concluded that the Commission would have denied Mr. Miller parole because of the number and serious nature of his institutional misconducts.  (*Id*., ECF pp. 12-13.)  Mr. Miller's representative "conceded that the Commission would have likely departed from the Grid score of 3 at the subject's 2006 Rehearing

---

[6] In 2008, the United States District Court for the District of Columbia held in *Sellmon* "that applications of the USPC's regulations to those DC offenders who had committed their offenses during the time period that the Board's guidelines were in effect (i.e., March 4, 1985 to August 4, 1999), violated the Ex Post Facto Clause of the U.S. Constitution." *Marshall v. Reiley*, 2014 WL 60066163, at *2 (M.D. Pa. 2014) (citing *Sellmon*, 551 F. Supp. 2d 66).

due to the number of disciplinary shots the subject had incurred." (*Id.*, ECF p. 13.) Mr. Miller's representative also "indicated that he thought it was likely that the Commission would again depart from the guidelines but the representative only asked that the subject have [a] Rehearing sooner than later." (*Id.*, ECF pp. 12-13.)

At the January 13, 2010 rehearing, Mr. Miller's TPS was 4, suggesting that parole be denied and a rehearing scheduled. (*Id.*, ECF p. 14.) Under the 1987 Guidelines a rehearing would ordinarily be scheduled within twelve months but the Hearing Examiner recommended departing from the guidelines based on Mr. Miller's serious negative institutional behavior. (*Id.*, ECF pp. 9-11.) Since his February 2006 rehearing Mr. Miller incurred a total of eighteen disciplinary infractions. (*Id.*, ECF p. 15.) Since June 2009, Mr. Miller incurred at least 12 "Class II infractions for Engaging in Sexual Acts and/or Indecent Exposure. Additionally, the subject has incurred two Class I shots for Possessing a Dangerous Weapon, (3) disciplinary infractions for Assault, and (1) disciplinary infraction for Making a Sexual Proposal." (*Id.*, ECF pp. 13-14.) "[T]he last two assaults occurred in October of 2009." (*Id.*, ECF p. 14.) Accordingly, the Hearing Examiner recommended adding seven months to his June 2012 rehearing date as it was necessary for Mr. Miller "to prove to the Commission that he can go for a sustained period of time without violating the rules of the institution." (*Id.*) Mr. Miller's representative indicated his disagreement with the later rehearing date "because he believes there is an element of vindictiveness on the part of the Commission in doing so." (*Id.*, ECF p. 13.) The Hearing Examiner responded that, had Mr. Miller not incurred any disciplinary

-14-

infractions since his June 2009 hearing, he "would have considered whether it was appropriate to go [with] the June, 2012, previously established rehearing date." (*Id*.) On March 13, 2010, the Commission issued its Notice of Action denying parole and setting a rehearing date "in January 2013 after the service of 36 months from your hearing date of January 13, 2010."[7] (*Id*., ECF p. 17.)

## V.     Discussion

The Ex Post Facto Clause of the United States Constitution prohibits retroactive increases in criminal punishment. U.S. CONST. art. I, § 9, cl. 3. A retroactively applied parole regulation, guideline or policy statement may violate the Ex Post Facto Clause if it creates "a significant risk" of "a longer period of incarceration than under the earlier rule." *Garner v. Jones*, 529 U.S. 244, 255, 120 S.Ct. 1362, 1370, 146 L.Ed.2d 236 (2000). Thus, "determin[ing] whether ... retroactive application of a new parole regime violates the Ex Post Facto Clause requires a 'searching comparison' of the two parole regimes." *Sellmon*, 551 F. Supp. 2d at 84 (citing *Fletcher v. Reilly*, 433 F.3d 867, 879 (D.C. Cir. 2006)).

The "controlling inquiry" is "one of practical effect." *Fletcher*, 433 F.3d at 877. Thus, the court "must assess the magnitude of the risk in terms of the practical effect of the change in regulations on the length of a [prisoner's] incarceration." *Id*. In other words, "plaintiffs may not prevail simply by showing facial differences

---

[7] The parties have not advised the Court of the outcome of that hearing; however, it is noted that Mr. Miller remains incarcerated. *See* BOP Inmate Locator, http://www.bop.gov/inmateloc/.

between the old and new policies.  Rather[,] plaintiffs must demonstrate that the practical effect of the new policies was to substantially increase the risk that they would [each] serve lengthier terms of incarceration." *Id.* at 91.

In order to prevail on an ex post facto challenge to a sentence, the petitioner has to show both that the law he challenges operated retroactively, that is, that it applied to conduct completed before its enactment, and that it raised the penalty from whatever the law provided when he acted. *Johnson v. United States*, 529 U.S. 694, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000); U.S. CONST. art. 1, § 9, cl. 3.  The purpose of the clause, as articulated by the United Supreme Court, is to prohibit "laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dept. of Corr. v. Morales*, 514 U.S. 499, 504, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995)(*citing Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990)).  The Court has not articulated a specific formula for "identifying those legislative changes that have a sufficient effect on ... punishments to fall within the constitutional prohibition on [ex post facto laws]." *Id*. at 509.  However, the Court has found that changes that create only the most "speculative and attenuated possibility of producing the prohibited effect" of increasing punishment do not run afoul of the ex post facto clause." *Id.*; *see also Garner,* 529 U.S. at 251, 120 S.Ct. at 1368 (legislative change to parole rules must at minimum create "significant risk of prolonging ... incarceration" to constitute a violation of the Ex Post Facto Clause); *Brown v. Williamson*, 314 F. App'x 492, 496 (3d Cir. 2009) (same).  A prisoner must adduce "some evidence" to show that the

law or policy "as applied to his own sentence ... created a significant risk of increasing his punishment." *Garner*, 529 U.S. at 255, 120 S.Ct. at 1370.

As a DC offender, Mr. Miller's parole eligibility is determined by the Commission pursuant to the DC Board's guidelines in place at the time the offense was committed, which in this case are the 1987 guidelines. *See Sellmon,* 551 F. Supp. 2d 85-86. In 2010, pursuant to the *Sellmon* ruling, the Commission reopened Mr. Miller's case and conducted a parole rehearing. At this rehearing, Mr. Miller was represented by counsel and the 1987 Guidelines were applied.[8] *See* Doc. 5-2, ECF p. 15. Given that most of the factors considered under the 1987 Guidelines were incorporated into the 2000 Guidelines, the court will take the relevant factors considered at Mr. Miller's parole rehearings and apply them to the 1987 Guidelines.

Initially the court notes that Mr. Miller does not argue that the Commission, under the 1987 Guidelines, was prohibited from considering his negative institutional adjustment, among other criteria, when deciding his suitability for parole or the establishment of his next rehearing date. Nevertheless, given the extensive and severe nature of the disciplinary infractions Mr. Miller incurred between his initial hearing and the later 2006 rehearing, and between his 2006 rehearing and his 2009 rehearing and/or 2010 *Sellmon* rehearing, it is clear the Commission did not abuse its discretion when it denied Mr. Miller parole on these occasions. (Doc. 5-1, ECF pp. 37-38; Doc. 5-2, ECF pp. 1-2; and Doc. 5-2, ECF pp. 17-18.) Moreover, Mr. Miller's counsel at the time of his 2010 *Sellmon* rehearing agreed "that the

---

[8] While Mr. Miller argues that he believes the 1987 Guidelines were not applied, he cites no persuasive authority or evidence to support this assertion.

Commission would have likely departed from the Grid Score of 3 at the subject's 2006 Rehearing due to the number of disciplinary shots the subject had incurred." (Doc. 5-2, ECF p. 12.)   A similar logic applies to his following rehearings where new misconducts were addressed.  Given Mr. Miller's misconduct history between rehearings, the departures were not only permissible, they were warranted. Therefore, because the Commission could have denied Mr. Miller parole and reparole under the 1987 Guidelines due to his negative institutional adjustment history, the court cannot reasonably infer that there is a significant risk of his prolonged incarceration based on the Commission's application of the 1987 Guidelines to his various parole encounters.  Mr.  Miller has not made a sufficient showing of an ex post facto violation and is not entitled to relief.  *Garner*, 529 U.S. 250, 120 S.Ct. at 1367.

To the extent Mr. Miller asserts the Commission violated his due process rights when departing from the 1987 guidelines which call for annual rehearings, this claim is also meritless.  As previously noted, the DC Board in its discretion could set a later reconsideration date.  *See Ellis*, 84 F.3d at 1419-20 (holding that the Board has discretion to depart from guidelines); *Blair-Bey v. Quick*, 151 F.3d 1036, 1047 (D.C. Cir. 1998)(prisoner has no liberty interest in parole or in the setting of a particular parole reconsideration date).  In each instance where the Commission departed from the ordinary annual rehearing schedule, the Commission stated its reason for exercising its discretion in this fashion, primarily Mr. Miller's institutional misconduct record.  There is a rational basis supported by the record for each time the Commission deviated from the normal set-off period.  Accordingly, Mr. Miller's

claim that the three-year parole reconsideration set-offs were vindictive or otherwise improper is unsupported. Therefore, Mr. Miller's claim that he was denied his "right" to annual parole hearings is denied.

Finally, Mr. Miller claims that the Commission violated his due process rights by applying the wrong guidelines at his parole hearings is unsupported. As noted above, there is no constitutionally established liberty interest in parole. *Greenholtz*, 442 U.S. 7, 99 S.Ct. at 2104. A liberty interest can only be created if it is articulated in mandatory statutory or regulatory language placing substantive limits on official discretion. *See Ky. v. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). Federal courts have concluded that the DC Board parole guidelines are so "discretionary and open-ended" that they cannot give rise to a due process claim. *Blair-Bey*, 151 F.3d at 1048; *see also McRae*, 667 A.2d 1357 ("The District's parole scheme confers discretion to grant or deny parole and the scoring system creates no liberty interest overriding the exercise of that discretion."). Accordingly, because no constitutionally recognized liberty interest can arise from parole determinations, the court denies Mr. Miller's due process claim.

For the foregoing reasons, the Petition for Writ of Habeas Corpus (Doc. 1) will be denied. An appropriate order follows.

>  **/s/ A. Richard Caputo**
>  **A. RICHARD CAPUTO**
>  **United States District Judge**

**Date: April 2, 2015**